UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| CONNIE BATCHELOR, SHAQUILA BUMPASS, JENNIFER CASTRO, and QRUINTRELL COOK,<br><br>    Plaintiffs,<br><br>v.<br><br>PAUL ROLSTON, individually, and the NAKAMOTO GROUP, INC.,<br><br>    Defendants. | Case No. |

**COMPLAINT FOR DAMAGES**

Plaintiffs sue Defendants and allege as follows:

**Jurisdiction**

1. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

2. This Court also has jurisdiction under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1972).

3. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c), as the events sued upon occurred in this judicial district.

5. All conditions precedent to this action have been performed or waived.

1

## Parties

6. At all times material hereto, Plaintiffs CONNIE BATCHELOR, SHAQUILLA BUMPASS, JENNIFER CASTRO, and QRUINTRELL COOK, were federal prisoners confined in FCI Tallahassee, in Tallahassee, Florida, within the Northern District of Florida.

7. At all times material hereto, Defendant PAUL ROLSTON was a Physicians' Assistant at FCI Tallahassee, which facility is within the Northern District of Florida. Defendant Rolston acted under color of law.

8. At all times material hereto, Defendant NAKAMOTO GROUP, INC., is a Delaware Corporation with its principal place of business in Maryland. Nakamoto Group, Inc., performed Prison Rape Elimination Act (PREA) audits under contract to the United States.

## Common Allegations of Fact

9. Between January 1, 2014, and the present, Plaintiffs were federal prisoners confined at Federal Correctional Institution (FCI) Tallahassee, Florida.

10. During their time at FCI Tallahassee, Physician's Assistant (PA) Paul Rolston assaulted numerous female prisoners at his clinic on the pretext of pelvic, anal, and breast exams, for sexual and other non-medical purposes.

11. During Plaintiffs' incarceration at FCI Tallahassee, PA Rolston would sexually assault women, including claimants, while performing putative

   Papanicolaou tests, breast, and rectal exams on female inmates.

12. Rolston repeatedly performed unnecessary intrusive intimate examinations with an unlawful, non-medical purpose on female inmates at his clinic, sometimes seeing patients without a chaperone, contrary to clinic rules.

13. Rolston ignored ethical, practical, and professional rules and guidelines intended to govern intimate and intrusive physical examinations of women.

14. Rolston sometimes falsely told women they were due for a Pap test and took Pap smear samples that were never submitted to a laboratory for analysis.

15. Rolston sometimes kept electronic examination records open for extended periods so that he could make changes to the data after the fact.

   **A. Connie Hallmark Batchelor**

16. Plaintiff Batchelor entered federal prison at FCI Tallahassee on June 12, 2017 and is due to be released in August of 2023.

17. Batchelor saw Defendant Rolston for hemorrhoids on November 29, 2018.

18. Rolston asked Batchelor if she had a recent Pap smear.

19. Batchelor said she had not and that she had a hysterectomy.

20. Rolston pressured Batchelor to submit to an unwanted Pap smear.

21. Rolston also did a breast exam and pinched her nipples.

22. Batchelor had never had a doctor pinch her nipples during a breast exam.

23. Batchelor did not complain of a discharge or other issues with her nipples.

24. Rolston also stimulated her clitoris by inserting his finger in her vagina and rubbing the clitoris with his thumb.

25. Batchelor had never had a doctor rub her clitoris during a pelvic exam.

26. Batchelor did not complain of any issues involving her clitoris.

27. Finally, Rolston checked her hemorrhoids.

28. Batchelor's chaperone was Letitia Davis.

29. Ms. Davis subsequently gave a sworn affidavit stating Rolston would often perform Pap Smear exams even if the patient is there for a headache.

30. Batchelor testified the clitoral stimulation may have lasted five seconds.

31. Batchelor stated that the clitoral stimulation was "nerve-wracking."

32. Later, Batchelor spoke with Plaintiff Beth Farber who said his rubbing her clitoris was even more intrusive and he "played with her breasts" too long.

33. Batchelor discovered Rolston had a reputation for doing such examinations.

34. Plaintiff Batchelor flashed back to sexual abuse she suffered as a child.

35. Batchelor said women in the prison would make a hand gesture when Rolston was mentioned, two fingers pointing out and a thumb rotating.

   **B. Shaquilla Bumpass**

36. Plaintiff Bumpass entered federal prison at FCI Tallahassee in early 2018, having been transferred from FPC Alderson.

37. Bumpass was transferred to FCI Tallahassee shortly after it was discovered

that Captain of FPC Alderson Jerrod Grimes had sexually assaulted at least five inmates, including Bumpass.

38. Grimes was convicted of the offense in early 2019.

39. In late September 2018, Ms. Bumpass was called to the medical unit.

40. When Ms. Bumpass arrived at the medical unit, she was summarily informed by Rolston that she was to be given a pelvic exam and pap smear.

41. Rolston inserted a speculum into Ms. Bumpass' vagina and inserted a curette for the collection of a pap smear culture.

42. Rolston shoved two fingers into Ms. Bumpass' rectum without warning.

43. Rolston abruptly proceeded to conduct an unconsented breast exam.

44. Bumpass was not of an age for which annual breast exams are considered necessary, absent indicators.

45. Rolston's putative "examination" of Bumpass' breasts consisted in his pinching her nipples while rubbing his erect penis against her right arm.

46. Rolston made no inquiries of Ms. Bumpass about a family history of breast cancer, nor did he palpate her breasts generally.

47. Rolston noticed that Ms. Bumpass was upset and crying, and he asked her if she had psychiatric problems.

48. Rolston then asked Bumpass if she had ever been sexually assaulted.

49. Ms. Davis was present in the room for the duration of Rolston's exam.

### C. Jennifer Castro

50. Plaintiff Castro entered FCI Tallahassee on September 27, 2018.

51. On or about September 27, 2018, Ms. Castro attended the medical unit at FCI Tallahassee for a routine health check.

52. While waiting for her health check, Ms. Castro was informed by other inmates in the waiting area that they refused to be treated by Rolston because of his reputation for using treatment encounters as an opportunity to sexually assault female inmates.

53. During what should have been a routine check-up, Rolston informed Ms. Castro that he planned to do a pelvic examination and pap smear.

54. Ms. Castro informed Rolston that she was menstruating and asked to delay the pelvic exam and pap smear for that reason.

55. Rolston insisted that Ms. Castro have a pap smear and pelvic examination.

56. While Ms. Castro was laying on the examination table, P.A. Rolston roughly pulled her labia apart and pulled back the hood of her clitoris.

57. Rolston then abruptly put two fingers into Ms. Castro's vagina and then immediately put the same fingers into her rectum.

58. Rolston then transitioned to Castro's chest and began a putative breast exam.

59. Castro did not consent to a breast examination, nor was she at the age for which a breast examination would be required, absent indicators.

60. Rolston's breast examination consisted in his pinching her nipples.

61. Rolston pressed his pelvis and erect penis against Ms. Castro's right arm for the duration of his "examination" of her breasts.

62. Castro did not feel that she could report this assault by PA Rolston since she believed that she would be blamed for the incident.

### D. Qruintrell Cook

63. Ms. Cook entered federal prison sometime after June of 2018.

64. In September or October of 2018, she was examined by Paul Rolston.

65. Cook was told to take off all her clothes except her socks.

66. Cook was given a paper gown and told to put her feet in the stirrups.

67. Rolston groped her breasts, cupped them together and pinched her nipples.

68. Rolston commented on tattoos on her breasts.

69. Rolston groped her vagina with both hands and opened the lips of her vagina, exposing her clitoris, saying he was "looking for discoloration."

70. After having done this, Rolston put on gloves for the first time.

71. Rolston put two fingers inside Cook's vagina and pushed against them with the fingers of his other hand from her stomach area.

72. Rolston removed his fingers from Cook's vagina and re-inserted them and moved them in a circular pattern.

73. Rolston then, without warning, forced fingers into Cook's rectum.

74. At the same time, Rolston pushed down on Cook's abdomen because she was trying to resist his actions.

75. Rolston then repeated the process going deeper.

76. Cook complained that she had never had a Pap exam done like that.

77. Defendant Rolston replied they must not have been done properly.

78. Rolston then made personal comments about shaving her pubic area.

## Causes of Action

### I.   Cruel and Unusual Punishment (*Bivens*): Paul Rolston

79. Each Plaintiff re-alleges the Common Allegations of Fact as to herself.

80. Plaintiffs are entitled to relief against Paul Rolston because he violated their Eighth Amendment rights through coercive sexual acts involving sexual penetration, more fully set out in the Common Allegations above.

81. Rolston intended this harmful and offensive contact, ostensibly part of his job but done for personal gratification rather than medical purposes.

82. The abuse of Plaintiffs by Rolston was accomplished under color of law and subjected and deprived Plaintiff of rights secured by the Eighth Amendment.

83. Rolston was emboldened to physically abuse inmates because the prior reports of sexual predations by him were never punished.

84. Repeated sexual and physical abuse is not part of the penalty criminal offenders pay for their offenses against society and constitutes a cognizable claim of cruel and unusual punishment under the Eighth Amendment.

85. As a result of the abuse of Plaintiff by Defendant Rolston, Plaintiffs suffered physical trauma and invasion of their persons, suffered and continue to suffer physical harm, emotional harm, anguish, insecurity, self-revulsion, damage to their self-esteem and self-worth, shame and humiliation. WHEREFORE, Plaintiffs seek relief as noted below.

## II. Negligence (Nakamoto Group, Inc.)

86. Each Plaintiff re-alleges the Common Allegations of Fact as to herself.

87. Plaintiffs are entitled to relief against Nakamoto Group, Inc., for negligence in conducting Prison Rape Elimination Act audits at FCI Tallahassee.

88. As mandated by PREA, the Bureau of Prisons (BOP) conducts PREA audits at each federal prison facility every three years. At all times relevant to this complaint, PREA audits for all BOP facilities were conducted by Nakamoto.

89. The primary purpose of the onsite phase of the PREA audit inspection is to assess the day-to-day practices used by facility staff to promote sexual safety and to prevent rape in prison. During the onsite phase of a PREA audit, auditors are supposed to conduct a thorough examination of the entire facility, observe routine activities, interview staff and inmates, and review

and retain key documents maintained by the facility.

90. During the "on-site review" component of an audit, PREA auditors are required to spend a number of days (usually three) at the facility conducting a site inspection and interviewing executive and rank- and-file staff and inmates randomly selected by the auditor during the site visit, or inmates previously identified by the facility as being fairly representative of a number of inmate social categories, such as: youthful inmates, inmates with limited English language proficiency and transgender inmates.

91. PREA audits are supposed to involve a careful process of documentation selection and review. These core components form the foundation of a practice-based audit methodology.

92. Prior to going onsite to a facility, Nakamoto failed to conduct a broad internet search on the audited facility to determine if there was relevant information that might shed light on the culture and history of the facility such as recent budgetary or staffing changes, legal action against the facility, press clippings, and other information that might inform the audit or if Nakamoto did conduct such a search it ignored readily available information regarding longstanding and ongoing sexual misconduct at FCI Tallahassee.

93. PREA Standard 115.401(h) states, that all auditors "[shall] have access to, and shall observe, all areas of the audited facilities." In order to meet the

requirements in this Standard, the site review portion of the onsite audit must include a thorough examination of the entire facility.

94. Nakamoto was required to be engaged with critical facility functions including but not limited to intake and risk screening; activity in the housing units; bathroom and shower procedures; staffing ratios; cameras and surveillance technology deployment and use; access to reporting entities; and supervision practices at FCI Tallahassee.

95. Nakamoto consistently failed to conduct thorough examinations of critical facility functions at FCI Tallahassee.

96. Nakamoto was required to review internal records at FCI Tallahassee as part of the auditing process, including but not limited to background check records; supervisory rounds logs; risk screening and intake processing records; medical files; and investigative files—including a review of a representative sample of each type of record.

97. Nakamoto failed to review appropriate records and/or failed to note discrepancies, irregularities or problems that should have been readily apparent from the well-known activities staff at FCI Tallahassee.

98. Systemic deficiencies in Nakamoto's inspections of FCI Tallahassee in failing to identify and address clear signs of endemic sexual abuse at the facility was a proximate cause of injuries suffered by Plaintiffs.

99. Nakamoto failed to use reasonable care and diligence to hire, train, and supervise its auditor staff to obtain sufficient facts to support all statements, conclusions, and findings of the audits performed at FCI Tallahassee.

### III.   Third Party Breach of Contract (Nakamoto Group, Inc.)

100. Each Plaintiff re-alleges the Common Allegations of Fact as to herself.

101. Nakamoto Group, Inc. (Nakamoto) operates as an SBA 8(a) Program minority business which, because of such status, receives preferential treatment in applying for and receiving bids on Federal contacts.

102. After having received federal contracts in unrelated areas of government work, Nakamoto entered into various contracts with the United States to perform audits of detention facilities (e.g., ICE facilities on the U.S. border) and to perform Prison Rape Elimination Act (PREA) audits of Bureau of Prisons correctional facilities.

103. As a part of the aforementioned contracting process, Nakamoto had a contract to perform PREA audits at FCI Tallahassee.

104. Upon information and belief, as may be shown by appropriate discovery, the contract regarding PREA audits for BOP correctional facilities, including FCI Tallahassee, have paid Nakamoto by way of consideration large sums of money measured in the millions of dollars.

105. The purpose of the Prison Rape Elimination Act (PREA) auditing function,

which the contract with Nakamoto was to provide for the BOP, was to ensure compliance with the mandates of PREA, 34 U.S. Code § 30301.

106. PREA's goal is to provide for the analysis of the incidence and effect of prison rape in Federal, State, and local institutions and provide information, resources, recommendations and funding to protect inmates from rape.

107. Plaintiffs at all times relevant to the allegations herein were federal inmates and thus individuals intended to be protected from prison rape.

108. Plaintiffs are persons the PREA auditing function was designed to protect.

109. The purpose of the Nakamoto contract was to benefit inmates like Plaintiffs.

110. Nakamoto breached the contract by failing to conduct appropriate and meaningful PREA audits and to make appropriate and meaningful reports which would have provided the BOP with the necessary information to take corrective action to not only fulfill the purpose of PREA "to protect individuals from prison rape" but to also help fulfill their mandated duty to "provide for the safekeeping, care, … of all persons charged with or convicted of offenses against the united states" and to "provide for the protection ... Of all persons charged with or convicted of offenses against the United States." under 18 U.S.C. § 4042(a)(2)-(3).

111. As a direct and proximate result of Nakamoto's the breach of the contract between Nakamoto and the BOP, Plaintiffs were injured as alleged above.

## Prayer for Relief

WHEREFORE, the Plaintiff respectfully seeks judgment as follows:

A. That the Court assume jurisdiction over this action;

B. Declare that the acts and omissions described herein violated Plaintiff's rights under the Constitution and Laws of the United States and Florida;

C. Award compensatory damages against each of the defendants herein;

D. Award punitive damages against Individual Defendants under federal law;

E. Provide a trial by jury on all issues so triable;

F. Such further relief as the Court deems just and proper.

Respectfully Submitted,

*s/James V. Cook*
James V. Cook, Esq.
Florida Bar Number 966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
(850) 222-8080; 561-0836 fax
cookjv@gmail.com

*s/Richard E. Johnson*
Richard E. Johnson, Esq.
Florida Bar Number 858323
Law Office of Richard E. Johnson
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 425-1997; 561-0836 fax
rick@rej-law.com

Attorneys for Plaintiffs

*s/Jay T. McCamic*
Jay T. McCamic, Esq.
WVSB# 2386
McCamic Law Firm, PLLC
80 12th Street, Ste. 305
P.O. Box 151
Wheeling, WV 26003
Telephone: 304-238-9460
Fax: 304-830-5324
jay@mccamic.com

*s/L. Dante diTrapano*
L. Danté diTrapano, Esq.
WVSB# 6778
Calwell Luce diTrapano, PLLC
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
dditrapano@cldlaw.com

Benjamin Adams, Esq.
WSB# 11454
badams@cldlaw.com
Alex McLaughlin, Esq.
WVSB# 9696
amclaughlin@cldlaw.com

s/Anthony I. Werner
Anthony I. Werner, Esq.
WVSB# 5203
John & Werner Law Offices, PLLC
Board of Trade Building, Ste. 200
80 - 12th Street
Wheeling, WV 26003
Telephone: 304-233-4380
Fax: 304-233-4387
awerner@johnwernerlaw.com

Attorneys for Plaintiffs